Approved: _____
ALEX ROSSMILLER / ALISON MOE
Assistant United States Attorneys

Before: HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA : **SEALED COMPLAINT**
:
- v. - : Violations of
: 18 U.S.C. §§ 1349, 1956,
WILLIAM TIERNEY, : and 2
a/k/a "Bill Johnson," and :
ROBERT TIERNEY, : COUNTY OF OFFENSE:
: BRONX
Defendants :
:
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

JEREMY ROSENMAN, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office, Southern District of New York, and charges as follows:

COUNT ONE
(Conspiracy to Commit Mail Fraud)

1. From in or about 2014, up to and including the present, in the Southern District of New York and elsewhere, WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit mail fraud in violation of Title 18, United States Code, Section 1341.

2. It was a part and an object of the conspiracy that WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting to do so, did place and cause to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and

did deposit and cause to be deposited matters and things to be
sent and delivered by private and commercial interstate
carriers, and did take and receive and cause to be taken and
received therefrom, such matters and things, and did cause such
matters and things to be delivered by mail and such carriers
according to the direction thereon, in violation of Title 18,
United States Code, Section 1341, to wit, WILLIAM TIERNEY and
ROBERT TIERNEY participated in a scheme to defraud donors and
potential donors to certain political action committees
("PACs"), including the National Campaign PAC, Voter Education
PAC, Grassroots Awareness PAC, Americans For Law Enforcement
PAC, Action Coalition PAC, Protect Our Future PAC, Life and
Liberty PAC, Republican Majority Campaign PAC, and
RightMarch.com PAC, by, among other things, sending and causing
to be sent through the mail fundraising solicitations containing
false and misleading statements regarding the operation of the
PACs and the use of donor money, resulting in the receipt of
more than $23 million in donations.

(Title 18, United States Code, Sections 1349.)

COUNT TWO
(Conspiracy to Commit Wire Fraud)

        3.    From in or about 2014, up to and including the
present, in the Southern District of New York and elsewhere,
WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit wire fraud in violation of
Title 18, United States Code, Section 1343.

        4.    It was a part and an object of the conspiracy
that WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY,
the defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by
means of wire, radio, and television communication in interstate
and foreign commerce, writings, signs, signals, pictures, and
sounds for the purpose of executing such scheme and artifice, in
violation of Title 18, United States Code, Section 1343, to wit,
WILLIAM TIERNEY, ROBERT TIERNEY, and others participated in a
scheme to defraud donors and potential donors to certain PACs,
including National Campaign PAC, Voter Education PAC, Grassroots
Awareness PAC, Americans For Law Enforcement PAC, Action
Coalition PAC, Protect Our Future PAC, Life and Liberty PAC,

Republican Majority Campaign PAC, and RightMarch.com PAC, by, among other things, causing to be transmitted fundraising solicitations, including through the use of interstate and international phone calls, containing false and misleading statements regarding the operation of the PACs and the use of donor money, resulting in the receipt of more than $23 million in donations.

(Title 18, United States Code, Section 1349.)

COUNT THREE
(Conspiracy to Commit Money Laundering)

5.     From at least in or about 2014, up to and including the present, in the Southern District of New York and elsewhere, WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate the money laundering laws of the United States.

6.     It was a part and an object of the conspiracy that WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, the proceeds of mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

7.     It was further a part and an object of the conspiracy that WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, the proceeds of mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity,

3

in violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

COUNT FOUR
(Conspiracy to Engage in Monetary Transactions in Property
Derived from Specified Unlawful Activity)

8.    From at least in or about 2014, up to and
including the present, in the Southern District of New York and
elsewhere, WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT
TIERNEY, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other to violate the money laundering
laws of the United States.

9.    It was further a part and an object of the
conspiracy that WILLIAM TIERNEY, a/k/a "Bill Johnson," and
ROBERT TIERNEY, the defendants, and others known and unknown, in
an offense involving and affecting interstate and foreign
commerce, knowingly would and did engage and attempt to engage
in a monetary transaction in criminally derived property of a
value greater than $10,000 that was derived from specified
unlawful activity, to wit, the proceeds of mail and wire fraud,
in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

10.    I am a Special Agent with the United States
Attorney's Office, Southern District of New York ("USAO"), and
I have been personally involved in the investigation of this
matter.  I am familiar with the information contained in this
affidavit based on my own personal participation in the
investigation, my review of documents, and conversations that
I have had with other law enforcement officers and other
individuals.  Because this affidavit is being submitted for the
limited purpose of establishing probable cause, it does not
include all the facts I have learned during the course of my
investigation.  Where the contents of documents and the actions,
statements, and conversations of others are reported herein,
they are reported in substance and in part, except where
otherwise indicated.

## Overview of the Fraudulent Scheme

11. As set forth below, since at least 2014, WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, have defrauded tens of thousands of donors to political action committees that they operated along with at least one additional co-conspirator not identified herein ("CC-1"). WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1 founded and directly operated approximately six PACs,[1] and managed, operated, or influenced three additional PACs[2] originally founded by others. These nine PACs – which collectively raised more than $23 million between 2014 and 2017, and more than $50 million in the past ten years – were scams, operated to enrich the defendants and their co-conspirators. The PACs targeted victims across the country, including in the Southern District of New York, raising funds on the basis of fraudulent representations that the donations would support education regarding, and the political campaigns of those who supported, "autism awareness," "law enforcement appreciation," and pro-life causes. In truth and in fact, virtually all of the money raised was paid to the scheme participants or else used to perpetuate the fraud through additional telemarketing and fundraising expenditures. Less than one percent (1%) of all donor money to the PACs was spent on political contributions during the relevant time period.

12. WILLIAM TIERNEY, a/k/a "Bill Johnson," and ROBERT TIERNEY, the defendants, and CC-1 used various means and methods to carry out the fraudulent scheme involving the nine PACs (hereafter, the "Scam PACs"), including but not limited to the following:

   a. The Scam PACs obtained donations based on false and misleading representations and material omissions about their purported efforts, activities, and spending. These representations were made in written fundraising solicitations, telephone call solicitations, public PAC filings with the Federal Election Commission ("FEC"), and websites associated with the Scam PACs. *See infra* paragraphs 17-19.

   b. WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1 created and utilized a web of shell pass-through entities to conceal and disguise their fraud. Donated funds were

---

[1] Grassroots Awareness PAC, Americans for Law Enforcement PAC, National Campaign PAC, Voter Education PAC, Action Coalition PAC, and Protect Our Future PAC.

[2] Life and Liberty PAC, Republican Majority Campaign PAC, and RightMarch.com PAC.

transferred to these shell entities, which were given names that suggested activities related to marketing, consulting, and communications efforts – so that payments to the shell entities would appear to be for legitimate expenditures. In truth and in fact, the shell entities had no active operations or employees. *See infra* paragraphs 27-31.

   c. The scheme utilized multiple fraudulent identities. WILLIAM TIERNEY used the fake identity of "Bill Johnson" when meeting and corresponding with officials at fundraising call centers he hired to raise money for certain of the PACs. Another fake identity, "Emma Smith," was used in fundraising solicitations, and was described as a "Volunteer Coordinator" for a Scam PAC; in truth and in fact, neither Emma Smith nor the position of "Volunteer Coordinator" actually existed. *See infra* paragraphs 33-36.

   d. The Scam PACs purposefully solicited and received almost entirely small-dollar donations, below the $200 threshold for FEC itemized disclosure requirements. *See infra* paragraphs 13 and 27.

   e. WILLIAM TIERNEY instructed two telemarketing vendors that received millions of dollars from certain of the Scam PACs to create shell subsidiary LLCs – which he referred to as "Stealth LLCs" – with names that avoided any discernable connection with their parent telemarketing vendors. WILLIAM TIERNEY further directed that each relevant Scam PAC should have its own Stealth LLC. This prevented the FEC, donors, and other members of the public from being able to learn from FEC disclosure forms that multiple Scam PACs were in fact paying the same telemarketing vendors. *See infra* paragraphs 34-35.

   f. WILLIAM TIERNEY, ROBERT TIERNEY, and others known and unknown undertook efforts to avoid press coverage of the Scam PACs, despite the PACs' public claims of national advocacy and awareness campaigns. WILLIAM TIERNEY also monitored media articles about fraudulent PACs, including in connection with evaluating whether to increase their de minimis political donations to avoid the suspicion of journalists. *See infra* paragraph 38.

## Background on PACs and the Scheme Participants

*Political Action Committees*

13.   Based on my participation in this investigation and my review of records, including publicly-available information, I have learned the following:

a.   A PAC is a type of political organization that can raise money to direct toward, for example and among other things, political parties, electoral campaigns, or issue-related expenditures.  Under federal campaign finance laws and regulations, such committees must register with the FEC and periodically report their financial activities.

b.   There are two types of PACs: (1) separate segregated funds, which generally are established by certain organizations and may solicit contributions only from individuals associated with those organizations, and (2) nonconnected PACs, which may solicit donations from the general public.

c.   Nonconnected PACs can be established by filing a form with the FEC that principally identifies the PAC's name, physical address, email address, internet website, and associated banking institution.  Such PACs also must regularly file public financial disclosure forms with the FEC, which must include, among other things, information about donations and expenditures.

d.   FEC rules require itemized disclosure for individuals making donations to PACs totaling $200 or more in a given year.

e.   Each of the Scam PACs has been registered with the FEC as a nonconnected PAC.

*Relevant Individuals*

14.   Based on my participation in this investigation and my review of records, including publicly available information, and my conversations with other law enforcement officers, I have learned the following about WILLIAM TIERNEY and ROBERT TIERNEY, the defendants:

a.   WILLIAM TIERNEY, a resident of Arizona, has described his employment status in financial records as, among other things, self-employed in the business of fundraising. During all times relevant to this Complaint, WILLIAM TIERNEY and

ROBERT TIERNEY owned, controlled, and/or influenced the operations of the Scam PACs and various associated entities, and arranged for various "call centers" to make solicitation phone calls on behalf of the Scam PACs. Based on my review of bank accounts held by WILLIAM TIERNEY, I believe that WILLIAM TIERNEY does not have any substantial source of additional income independent of his operation and management of the Scam PACs. In or about 2017, in a financial disclosure form, WILLIAM TIERNEY estimated his liquid net worth as $8.5 million.

       b.    WILLIAM TIERNEY is designated as a signatory or manager for accounts or agreements with a bank located in Washington, D.C. (the "Washington Bank") in the name of six of the Scam PACs: National Campaign PAC, Voter Education PAC, Grassroots Awareness PAC, Protect Our Future PAC, Life and Liberty PAC, and Republican Majority Campaign PAC.  He also is listed as a signatory, President, Owner, or CEO in connection with approximately fifteen additional deposit accounts associated with the Scam PACs.  Websites for many of the Scam PACs have been registered or renewed using contact and billing information associated with WILLIAM TIERNEY.  As described in more detail below, in connection with the crimes alleged herein, WILLIAM TIERNEY has falsely represented himself to individuals and entities associated with the business of certain of the Scam PACs using the fraudulent identity "Bill Johnson."

       15.   Based on my participation in this investigation and my review of records, including publicly available information, and my conversations with other law enforcement officers, I have learned the following about ROBERT TIERNEY, the defendant:

       a.    ROBERT TIERNEY, a resident of Arizona, is the brother of WILLIAM TIERNEY, the defendant.  ROBERT TIERNEY is designated as a signatory for Washington Bank accounts or agreements in the name of seven of the Scam PACs: Voter Education PAC, Grassroots Awareness PAC, Americans for Law Enforcement PAC, Action Coalition PAC, Protect Our Future PAC, Life and Liberty PAC, and Republican Majority Campaign PAC.  ROBERT TIERNEY is also listed as a signatory of approximately four additional accounts associated with the Scam PACs.  ROBERT TIERNEY also received and proposed language for fundraising solicitation scripts.

       16.   CC-1 works directly with WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, in operating the Scam PACs and other entities involved in the schemes.  National Campaign PAC

and Voter Education PAC list as their respective Treasurers a
name that is the middle and last names of CC-1.  CC-1 is
designated as a signatory for Washington Bank accounts in the
name of six of the Scam PACs: National Campaign PAC, Voter
Education PAC, Grassroots Awareness PAC, Americans for Law
Enforcement PAC, Action Coalition PAC, and Protect Our Future
PAC.  CC-1 is also listed as a signatory or secretary of
approximately eight additional accounts associated with the
Scam PACs.  Websites for various of the PACs have been
registered or renewed using information associated with CC-1.

### False and Misleading Representations by the Scam PACs

*Statements Made by the Scam PACs to Donors*

17.    The Scam PACs associated with WILLIAM TIERNEY and
ROBERT TIERNEY, the defendants, and co-conspirators known and
unknown have claimed to support various causes, as described in
fundraising solicitations by mail; by telephone, using live
telemarketers with fundraising scripts as well as pre-recorded
messages; and on websites.  These claims contained numerous false
and misleading statements regarding the operation of the Scam
PACs and the purposes to which donated money would be directed.
As set forth in more detail below, the fundraising solicitations
falsely stated and suggested that the PACs were involved in
nationwide educational and advocacy campaigns surrounding causes
such as autism, the right to life, and law enforcement
appreciation, and further stated that the campaigns involved,
among other things, education efforts, grassroots organizing, and
support for political candidates, among other efforts.  In truth
and in fact, the Scam PACs did not engage in such campaigns or
activities during the charged period, and made only de minimis
donations to political candidates as described below.

18.    Specifically, other law enforcement officers and
I have reviewed audio-recorded fundraising calls, written
scripts for fundraising calls,[3] fundraising solicitation
mailings, and websites associated with the Scam PACs, and as a
result have learned that they made the following written and
oral statements and solicitations to prospective donors, among
others, during the charged period:

---

[3] Such scripts were received by the Government from telemarketing
companies that operated fundraising campaigns for certain of the
Scam PACs at the direction of WILLIAM TIERNEY and ROBERT TIERNEY,
the defendants, as well as obtained pursuant to judicially-
authorized search warrants as further described below.

### Grassroots Awareness PAC

a.    Grassroots Awareness PAC, which first
registered with the FEC in 2016, purported to be "dedicated to
raising awareness and advocating on behalf of children with
autism spectrum disorder and other important health issues
affecting Americans."  It solicited donations, by phone and
mail, under the "project" name of "Autism Awareness."

b.    Autism Awareness claimed to "educate our
community about autism spectrum disorder, and mobilize political
support for autism research and services to help children with
autism and their families."  Autism Awareness further claimed to
be "a grassroots organization working to improve the lives of
children with autism spectrum disorder and their families
through awareness and political action."  It asserted that the
purported organization "address[es] through the political
process some of the most pressing concerns for children with
autism and their families [...]" and that it was "launching a
new effort from coast to coast to educate the public about
autism [...]."

c.    Autism Awareness claimed that it was "proud
to maintain the high standards of fiscal accountability" and to
"make regular reports available to the public about
contributions and expenditures" so contributors "know their
donation is a worthwhile investment, one that is leveraged
through effective political action [...]."

### Americans for Law Enforcement PAC

d.    Americans for Law Enforcement PAC, which
first registered with the FEC in 2016,[4] purported to be "an
urgent effort to raise up the voices of everyday Americans in
support of our nation's police and sheriff's deputies as they
battle crime and work to keep our communities safe."  It
solicited donations, by phone and mail, under the "project" name
of "Law Enforcement Coalition."

e.    Law Enforcement Coalition stated in
solicitation mailings and on its website that it "builds support
nationwide for local law enforcement" and had "mobilized much
needed support" for certain legislation.  It also claimed that
it was committed to "Remembering forever the sacrifice of fallen
heroes and their families," "Championing the interests of the

---

[4] Termination paperwork for Americans for Law Enforcement PAC was
filed with the FEC in or about January 2018.

10

most innocent victims of crime-children!", and "promoting the rights of crime victims."  It claimed to be "having a fundraising drive to provide strong political support to our police officers and sheriff's deputies."  Additionally, it asserted that it was soliciting contributions that would, among other things, help it "use direct mail, the internet and phone banks to share our message" and to "recruit new supporters."

<u>National Campaign PAC</u>

f.   National Campaign PAC, which first registered with the FEC in 2014,[5] asserted that its "mission is to save unborn babies from abortion" and that its goal was to "change hearts, change leaders and change laws until the day arrives when every child is welcomed into life and protected by law."  It solicited donations, by phone and mail, under the "project" name of the "Pro-Life Committee."

g.   In solicitation mailings, the Pro-Life Committee project stated that it was "out there every day, <u>persuading people</u> and <u>changing minds</u>"[6] and that it intended to "reach persuadable Americans in key areas across the country."  It stated that donations would help it to "Work with allies in churches and pro-life activists across the country."  The Pro-Life Committee project further claimed in solicitation mailings: "We're being very careful with our spending, not wasting it on expensive overhead or unnecessary expenses.  We want to invest every penny we can in the big races to come, and <u>make sure your donations to us are money well spent</u>."

h.   Based on my review of relevant solicitation scripts, I am aware that the National Campaign PAC claimed in fundraising phone calls to be "launching a new effort from coast to coast to bring voters' attention to the issue of abortion and the humanity of the unborn" and that contributions would help the Pro-Life Committee "use phone banks, direct mail and the Internet to identify, educate and mobilize pro-life voters across the country."  The scripts also stated that "detailed information about Pro-Life Committee's receipts and expenditures is available from the Federal Election Commission."

---

[5] Termination paperwork for National Campaign PAC was filed with the FEC in or about January 2018.

[6] Emphases throughout this Complaint are in original unless otherwise specified.

## Voter Education PAC

i.   Voter Education PAC, which first registered
with the FEC in 2015, purported to be "working to elect
conservative Republicans and championing individual liberty,
smaller government, traditional values, economic opportunity, a
strong national defense and energy independence" and to be
"working to take our conservative message to every American."
It solicited donations, by phone and mail, under the "project"
name of "Republican Victory Campaign."

j.   The Republican Victory Campaign website
("Website-1") stated that it provided information about the
"Republican Victory Campaign" project and was paid for by Voter
Education PAC.  A credit card in the name of WILLIAM TIERNEY,
the defendant, was used to pay for the registration and renewal
of Website-1.  Website-1 did not include contact information for
Voter Education PAC or its Republican Victory Campaign project.

## Action Coalition PAC

k.   Action Coalition PAC, which first registered
with the FEC in 2017, purported to be "committed to sharing the
pro-life message with as many Americans as possible" and stated:
"Through mailings, the telephone and the Internet, we're
educating people about abortion and urging everyone to support
pro-life legislation and pro-life candidates."  It solicited
donations, by phone and mail, under the "project" name of
"Pro-Life Action Coalition."

l.   Based on my review of relevant solicitation
scripts, I am aware that Action Coalition PAC claimed in
fundraising calls to be "helping share the pro-life message in a
way that ... will help change hearts," and that it was
"launching a new effort from coast to coast to bring people's
attention to the issue of abortion and the humanity of the
unborn."  A script by Action Coalition PAC further stated: "Your
gift will help the Pro-Life Action Coalition use phone banks,
direct mail and the Internet to identify, educate and mobilize
pro-life voters across the country, as well as to recruit new
supporters and raise financial support."

m.   Action Coalition PAC scripts used in
fundraising phone calls further stated: "I can assure you of the
our [sic] organization's financial integrity. As a federal
political action committee, we are subject to the registration
requirements and oversight of the Federal Election Commission in
Washington, D.C."

Protect Our Future PAC

n.      Protect Our Future PAC, which first
registered with the FEC in 2017, claimed to be "committed to
ending the tragedy of abortion" and "blessed to be able to use
our talents to call attention to the pro-life issue and mobilize
pro-life people for effective action."  It further stated that
it was using "the mail, telephone, internet and petitions" to
reach "more and more people each day."

o.      Protect Our Future PAC operated under the
project name "the Pro-Life Committee," which it described as a
"citizen action project."  The Pro-Life Committee listed its
contact information as a Washington D.C.-based phone number and
a PO Box in Washington D.C.

Life and Liberty PAC, Republican Majority Campaign PAC,
and RightMarch.com PAC

p.      Life and Liberty PAC, Republican Majority
Campaign PAC, and RightMarch.com PAC are the three Scam PACs
that, as noted above, originally were founded by other
individuals but have been managed and operated by WILLIAM
TIERNEY and ROBERT TIERNEY, the defendants, as well as CC-1.

q.      Life and Liberty PAC, which first registered
with the FEC in 2007, claimed to be "dedicated to forthright
pro-life public advocacy, enacting or changing laws to reflect
pro-life policies, and supporting pro-life candidates for public
office."  It operated under the project name "Pro-Life
Campaign," which it stated was "to help make every unborn child
welcome in life and protected by law."  It further stated that
donor contributions would "help us educate and mobilize pro-life
voters across the country, and to recruit and equip the new
leaders who must be raised up [....]" and that contributions
were not tax deductible "because of our activism."

r.      Republican Majority Campaign PAC, which
first registered with the FEC in 2007, claimed that it "work[ed]
to spread Republican ideas and promote good government by
identifying, educating, and mobilizing voters in support of
Republican candidates and important issues."

s.      RightMarch.com PAC, which first registered
with the FEC in 2003, fundraised under the slogan or program
"Campaign to Stop Illegal Immigration."[7]  In or about 2016,

---

[7] Termination paperwork for RightMarch.com PAC was filed with the
FEC in or about 2016.

shortly before RightMarch.com PAC was terminated, the individual listed as its Treasurer sent an email to WILLIAM TIERNEY seeking, in sum and in part, "to finally get this PAC out of my life."

19.  Other law enforcement officers and I have interviewed more than fifteen individuals who donated to certain of the Scam PACs (the "Victim Donors") after receiving telephone and/or mail solicitations.  Based on those interviews, I have learned, among other things, that the Victim Donors believed that the money they donated would be spent on supporting the causes espoused by the PACs.  For example, in sum and substance, Victim Donors who donated to "Autism Awareness" believed their money would be spent on research for autism; Victim Donors who donated to the "Law Enforcement Coalition" believed their money would go to support law enforcement agencies and departments; and Victim Donors who donated to the Pro-Life Committee believed their money would be used to support anti-abortion activism.[8]

*The Scam PACs Do Not Engage in Political Advocacy and Use Donations Almost Exclusively to Enrich the Defendants and to Continue the Fraudulent Scheme*

20.  The investigation has revealed that despite Scam PAC representations in written and oral statements and solicitations, as detailed above, during the charged period the PACs engaged in no issue-based or other political advocacy; had no "coast to coast campaigns" aside from the very fundraising calls in which those campaigns were referenced; and gave only de minimis amounts of political causes or candidates.  They did not "advocate on behalf of" or "educate [the] community" about the issues to which they are purportedly dedicated.  They were not "out there every day, persuading people and changing minds." And they did not, for example, "provide strong political support to our police officers and sheriff's deputies"; work on "chang[ing] leaders and chang[ing] laws" or with "allies in churches" for a pro-life agenda; or "work[] to elect conservative republicans" or "invest every penny ... in the big races to come."

21.  Indeed, the Scam PACs appear to have little or no operations whatsoever beyond the fundraising calls and

---

[8] WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, and CC-1 established at least two additional PACs in 2017, including Health Awareness PAC and Election Victory Fund PAC.  According to FEC disclosures, neither of these PACs has yet received any donations.

solicitation mailings themselves.  Through the course of this investigation, the Government has obtained hundreds of thousands of emails from accounts used by WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, CC-1, and others, obtained pursuant to a judicially-authorized search warrant on seven email accounts used in connection with the scheme (the "Email Search Warrant Returns"); bank account data for more than 50 accounts affiliated with the Scam PACs and the defendants; and a wide variety of other records pertinent to the Scam PACs.  Review of this material by myself and other law enforcement officers revealed no advocacy campaigns; no political operations; no employees of the Scam PACs; no volunteers associated with the Scam PACs; no outreach to political organizations, media, or other advocacy organizations; and exceedingly limited political contributions, as described below.

22.  For example, as described above, an Action Coalition PAC script indicated that the PAC would "use phone banks, direct mail and the Internet to identify, educate and mobilize pro-life voters across the country, as well as to recruit new supporters and raise financial support."  However, a review of relevant Action Coalition PAC scripts, solicitation mailings, and financial expenditures revealed no such efforts aside from the fundraising and solicitation calls in which those purported efforts are described.  Nor do any of the relevant scripts indicate an effort to "recruit new supporters."

23.  Similarly, the National Campaign PAC purported to donors to be engaged in campaigns "persuading people and changing minds."  In fact, I have learned based on a review of relevant documents that scripts and draft scripts for National Campaign PAC, Action Coalition PAC, and Life and Liberty PAC solicitation calls directed that those calls begin by asking whether the call recipient was pro-life, pro-choice, or somewhere in between, and further directed that the call be immediately terminated if the call recipient indicated he or she was not already pro-life.

24.  Based on a review of the Email Search Warrant Returns, I have learned that WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, have corresponded about particular Scam PAC solicitation scripts numerous times during the charged period, including to propose and review solicitations containing false and misleading representations.  For example:

a.  In or about January 2014, ROBERT TIERNEY sent an email to WILLIAM TIERNEY titled "script language" that included in its text, among other language, "so we are asking,

and it is sincere when we say, may the good Lord bring your gift
back to you and your household, one hundred fold, if we get a
letter out, could you help us with a gift of $100 or $200? [...]
we founded our nation under god, mam, and we're going to keep
our nation under god."

b.    In or about November 2016, WILLIAM TIERNEY
sent an email to ROBERT TIERNEY titled "autism and pro-life non-
donor script" that included a link to an "Autism Script" and
attached a script for National Campaign PAC.  That script
included claims, among others, that the "Pro-Life Committee" was
"launching an [sic] new effort from coast to coast to bring
voters' attention to the issue of abortion and the humanity of
the unborn" and that it planned to "identify, educate and
mobilize pro-life voters across the country, as well as to
recruit new pro-life supporters [...]."

c.    In or about November 2016, WILLIAM TIERNEY
sent an email to ROBERT TIERNEY titled "Longer script" that
attached a script for Grassroots Awareness PAC.  That script
included claims, among others, that "Autism Awareness" was
"launching a new effort from coast to coast to educate the
public about autism [...]."

d.    In or about January 2017, ROBERT TIERNEY
sent an email to WILLIAM TIERNEY and other individuals titled
"Autism Awareness Donor Script" that included a link to a donor
script.

25.  In addition, while the certain of the Scam PACs
are ostensibly in the business of promoting awareness for and
funding certain political causes, there appears to be no way to
successfully contact them to help promote those causes and/or
volunteer.  For example, while certain of the Scam PACs
technically enable individuals to contact the PACs through an
online portal, numerous attempts to do so by an undercover law
enforcement officer ("UC-1"), using undercover names and
accounts, were unsuccessful.  Specifically, between January and
February 2018, UC-1 visited the websites for three of the Scam
PACs and submitted information indicating a desire to volunteer
and requesting a response; during the same time period, UC-1
placed recorded calls to contact numbers available on two Scam
PAC websites and left messages requesting a return call.  As of
today's date, UC-1 has not received a response to any of these
outreach efforts.

26. Further, as set forth in more detail below, bank
account records for the Scam PACs and other related entities

reveal no payments to organizations for political, marketing, or other purposes that would traditionally be associated with PACs or political causes or efforts, and only de minimis donations to political candidates totaling less than one percent (1%) of the total funds raised by the Scam PACs from 2014 to 2017. Further, in disposing of Scam PAC donations, WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, and CC-1 utilized a complex series of financial transactions involving numerous bank accounts, designed to conceal the fact that nearly all the donated funds were used to further the fundraising scheme and enrich the defendants.

27. Specifically, based on my participation in this investigation, my conversations with other law enforcement officers, my conversations with witnesses and financial analysts, and my review of records, including bank account statements and materials for more than 50 bank accounts linked to WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, CC-1, the Scam PACs, and their associated entities for the time period 2014 through 2017, I have learned the following about the flow of funds donated to the Scam PACs:

a. Following their phone and mail solicitations, the Scam PACs received donations via check or credit card. The Scam PACs solicited and received almost entirely small-dollar donations, under $200 - below the $200 threshold for FEC itemized disclosure requirements.

b. Donor money was first deposited into Scam PAC accounts at the Washington Bank, and then almost entirely transferred to still other accounts for each Scam PAC at either a different bank or an escrow company (the "PAC Accounts"). The signatories to each of these accounts were combinations of WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1.

c. Pursuant to agreements executed by WILLIAM TIERNEY, ROBERT TIERNEY, and/or CC-1, the Washington Bank account for each active Scam PAC has designated "payee" terms, such that donations to any such payee may be deposited to that account. Certain of the Scam PACs have numerous payee terms that appear to cover disparate causes and/or goals. For example, WILLIAM TIERNEY and CC-1 designated the payees of National Campaign PAC as "National Campaign," "Pro-Life Committee," "Tea Party National Campaign," "Republican Victory Campaign," "Gun Right National Campaign," "Pro-Life," "Tea Party," "Republican Victory," "Republican," and "Gun Right."

d.      The PAC Accounts appear to have served as the "operating" accounts for the Scam PACs, and expenditures from these accounts were documented on Scam PAC FEC disclosure forms, as further described below.[9]  The PAC Accounts – both directly and through intermediary accounts – used an extremely small portion of the PACs' money for political donations. Indeed, according to the Scam PACs' own FEC disclosure filings, contributions to candidates for political office by the six Scam PACs created and managed by the defendants have totaled approximately 0.71% of the more than $14 million in donations received by those PACs through 2017.  Specifically, from their respective dates of creation through 2017, each of the six Scam PACs established, managed, and operated by WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1 in or after 2014 allocated approximately the following percentages of donor contributions to political candidates:

    i.  National Campaign PAC: 0.41%

    ii.  Voter Education PAC: 1.38%

    iii.  Grassroots Awareness PAC: 0.75%

    iv.  Americans for Law Enforcement PAC: 2.46%

    v.  Protect Our Future PAC: 0.00%

    vi.  Action Coalition PAC[10]: 0.00%

e.      Additionally, with respect to the three Scam PACs established by other individuals prior to 2014 but managed, operated, or influenced by the defendants within the charged period, those PACs allocated approximately the following percentages of donor contributions to political candidates from the 2013-14 cycle through 2017:

---

[9] For certain PAC Accounts that were escrow accounts, funds were moved out of the escrow accounts into additional bank accounts before being disbursed.

[10] Action Coalition PAC, unlike the other Scam PACs, is a Super PAC, which accordingly is not permitted to make contributions to candidates.  In 2017, Action Coalition PAC purported to have donated $16,400 to federal political candidates; in 2018, those donations were canceled or refunded.  The FEC filings for Action Coalition PAC reflect that it has not made any independent expenditures.

    i. Life and Liberty PAC: 0.02%

    ii. Republican Majority Campaign PAC: 0.08%

    iii. RightMarch.com PAC: 0.00%

   f. Aside from these minimal donations, as well as certain other costs and fees, the remaining funds in the PAC Accounts – comprising the overwhelming majority of the money donated to the PACs – were transferred to a series of pass-through bank accounts (the "Shell Accounts") principally in the names of shell entities established and managed by the defendants and CC-1 (the "Shell Entities"), or directly to call centers for additional fundraising.[11]  In most instances, the relevant shell entities appear to have been incorporated to create the appearance, including in FEC disclosures, that PAC money was being used to pay political consulting, marketing, communications, or similar costs, when in reality the entities and their bank accounts were simply used to move money from the Scam PACs to other bank accounts used primarily for additional fundraising, and to perpetuate the scheme to pay WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1.

   g. For example, one of the Shell Entities was named "Political Issue Advocacy."  In FEC filings, National Campaign PAC and Voter Education PAC have declared that they paid more than $4.5 million dollars to Political Issue Advocacy, thereby creating the impression that those two PACs were spending millions of dollars of donor contributions on political advocacy efforts.  However, the entity "Political Issue Advocacy" is owned and controlled by WILLIAM TIERNEY and does not appear to be a going concern, or to have employees, physical space, or clients other than the two PACs themselves.  Specifically:

    i. The website for Political Issue Advocacy was registered just six weeks prior to the creation and initial FEC filing of National Campaign PAC, including through a credit card belonging to WILLIAM TIERNEY.  That website states that Political Issue Advocacy "provides effective direct marketing and political consulting services to trade associations, candidate campaigns, political action committees and nonprofit organizations."

---

[11] Certain of the Scam PACs have received additional donations, and made additional expenditures to political candidates, in 2018.  Those amounts are not incorporated herein.

      ii.     In truth and in fact, bank account analysis shows that Political Issue Advocacy is funded exclusively by Scam PAC donor contributions from the PAC Accounts, and transfers more than 99% of its incoming money to other accounts controlled by the defendants and to WILLIAM TIERNEY himself. Analysis by law enforcement officers also revealed that the Political Issue Advocacy bank account does not appear to have ever received any payment from a trade association, candidate campaign, or nonprofit organization.[12]

      iii.     Based on a review of publicly-available FEC records, no PAC other than National Campaign PAC and Voter Education PAC has declared Political Issue Advocacy as a recipient of expenditures.

      h.     Additional Shell Entities whose Shell Accounts received money from the PAC Accounts were similarly titled to suggest that Scam PAC payments to those entities reflected legitimate political and/or advocacy expenditures. For example, some of the entities were titled RFP Services, Community Outreach, Alliance Marketing, and Victory Marketing. WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1 are listed as signatories and officers to bank accounts for these entities in various combinations.

      i.     Analysis of the relevant bank accounts by law enforcement officers revealed that, similar to Political Issue Advocacy, these entities do not appear to have employees, operations, or other indicia of having active operations. Instead, as with Political Issue Advocacy, they appear to exist to receive donor contributions from the PAC Accounts and transfer those contributions to other accounts controlled by WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1. These entities are reported on FEC disclosure forms as being the recipients of Scam PAC expenditures in amounts totaling hundreds of thousands of dollars, creating the misleading impression that such

---

[12] On or about December 23, 2017, UC-1 sent an email (the "UC-1 PIA Email") to the contact email listed on the Political Issue Advocacy website. The UC-1 PIA Email stated, in sum and substance, that UC-1 was involved in local politics and was interested in engaging Political Issue Advocacy for its assistance, and providing a return contact email and phone number. As of today's date, there has been no response to the phone number or email address provided in the UC-1 PIA Email.

expenditures are being directed toward the type of activities suggested by the names of the entities.[13]

       j.    Based on my review of bank records, I have learned that in or about September 2016 and January 2017, WILLIAM TIERNEY received more than $1 million directly from two of the PAC Accounts. Specifically, in a total of four wire and checking transactions on September 21, 2016, and January 25, 2017, WILLIAM TIERNEY moved a total of approximately $1,194,000 of Scam PAC donations from Political Issue Advocacy and RFP Services to his personal bank account. Two days after those transactions were completed, on or about January 27, 2017, WILLIAM TIERNEY wrote a check from his personal account to an account he holds at a brokerage service in the amount of $1,001,000.

       k.    Other than paying WILLIAM TIERNEY directly, donor contributions transferred from the PAC Accounts to the Shell Accounts were almost entirely transferred to yet another layer of accounts, in the name of additional entities controlled and operated by WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1, including companies named Edison Consulting, Insight Consulting, Compliance Consulting, and Blue Print Property Management. Based on my review of documents, including bank account records, I believe that most of these entities similarly exist only on paper, as pass-through entities.[14]

       l.    From this additional layer of Shell Accounts, the funds were almost entirely (i) used to pay fundraising costs, including call center costs, and overhead expenses for the Scam PACs; (ii) directed toward the personal expenses or accounts of WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1; or (iii) transferred to related-party accounts for these same purposes.

---

[13] Some of the Shell Accounts made relatively small payments or transfers to third parties, including for bank fees, LLC registration fees, and direct mail costs.

[14] Some of the Shell Accounts transferred donor money to an account for Political Call Center, LLC ("PCC"), which I believe, based on the investigation, to be an active call center where some of the fundraising calls for the Scam PACs were made. I further believe, based on tax and financial documents in which WILLIAM TIERNEY listed himself as controlling PCC, that the PCC is owned and operated by WILLIAM TIERNEY, the defendant. PCC is also referred to as, and does business as, "Political Advertising."

28.   Based on my involvement with this investigation,
my conversations with other law enforcement officers, my review
of bank account and other records, and my review of the Email
Search Warrant Returns, I have learned that WILLIAM TIERNEY and
ROBERT TIERNEY, the defendants, and CC-1 corresponded about the
finances of various of the entities described above.   For
example:

a.   In or about December 2016, CC-1 sent an
email to WILLIAM TIERNEY and ROBERT TIERNEY titled "Nov P & L's"
that stated, "Here are the P & L's for November."   An attached
file, titled "Consolidated Nov 2016," was a financial
spreadsheet reflecting detailed income and expense records for
Edison Consulting, Insight Consulting, Political Issue Advocacy,
RFP Services, Community Outreach, Political Call Center,
National Campaign [PAC], and Voter Education [PAC].   For the two
PACs, the spreadsheet listed contributions under the categories
"Total Income" and "Gross Profit."   Additionally, Political
Issue Advocacy and RFP Services, both pass-through entities
exclusively funded by donor money, had income entries for
"sales," and listed expenses only for "direct mail services" and
"phone banks."   The spreadsheet did not indicate that any of the
entities had expenses for political donations or any other
political or advocacy spending.

b.   In or about March 2015, CC-1 sent an email
to WILLIAM TIERNEY and ROBERT TIERNEY, titled "Feb P & L,"
attaching profit and loss statements for February 2015 for
certain Scam PACs and related entities that existed at that
time.   Similarly, in or about August 2015, CC-1 sent an email to
WILLIAM TIERNEY and ROBERT TIERNEY, titled "July P & L,"
attaching profit and loss statements for July 2015 for certain
Scam PACs and related entities that existed at that time.   These
profit and loss spreadsheets again described contributions under
the category "Gross Profit."   Political Issue Advocacy and RFP
Services had income entries for "sales" and expenses for "direct
mail services" and "phone banks."

29.   Based on my involvement with this investigation,
my conversations with other law enforcement officers, and my
review of bank account and other records, I have learned that
donations processed by the Washington Bank from 2014 through
2017 for the Scam PACs totaled more than $23 million.   During
that time period, those donations appear to have been used to
fund expenses including in the following categories and
approximate amounts:

       a.   More than $14 million in payments associated with telephone and direct mail fundraising, including more than $12 million to telemarketing companies and centers to engage in the fraudulent fundraising efforts described herein, including one, Political Call Center, LLC ("PCC"), owned and operated by WILLIAM TIERNEY, the defendant, for telephone fundraising solicitations.

       b.   More than $2 million in payments associated with overhead and fees, including more than $600,000 in internet/phone bills, $500,000 in bank and credit card processing fees and financial services payments, more than $300,000 in payments to individuals not described herein, more than $250,000 in payments relating to real estate, and more than $200,000 in payments for other professional fees and overhead expenditures.[15]

       c.   Approximately $109,000 in donations to political candidates.

       d.   More than $3 million paid to WILLIAM TIERNEY, the defendant.

       e.   More than $600,000 paid to ROBERT TIERNEY, the defendant.

       f.   More than $250,000 paid to CC-1.

## The Defendants and the Scam PACs Make Efforts to Conceal Their Wrongdoing and Evade Detection

       30.   In order to further the scheme to enrich themselves through the Scam PACs, WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, and CC-1 took significant efforts to conceal their activities, including through reports filed with the FEC, and by creating and using fictitious identities.

*The Schemes Use Shell Entities, And Instructed Telemarketing Companies to Create Shell Subsidiaries, Resulting in Misleading FEC Filings*

       31.   Based on my participation in this investigation, my conversations with other law enforcement officers, my

---

[15] The expenses also included (a) more than $675,000 in federal and state tax payments; and (b) more than $500,000 in credit card payments not otherwise described herein, including overhead costs and personal expenses, for example, more than $35,000 in payments to food and beverage establishments.

conversations with witnesses, and my review of records, I have learned the following:

a.   As noted above, PACs are required to file certain reports with the FEC, which are publicly available on the FEC's website. Required filings include, among other documents, semiannual reports reflecting itemized receipts and disbursements. Each itemized disbursement must be identified by, among other things, date, amount of payment, name of the payee, and disbursement description and purpose.

b.   In FEC filings, the Scam PACs reported millions of dollars of funds as being disbursed to the Shell Entities, which, as noted above, generally have names consistent with businesses or activities associated with political advocacy, marketing, or communications. However, as described above, these entities exist in name only, serving to receive donor money from Scam PAC accounts and routing it either directly to WILLIAM TIERNEY or to bank accounts for other entities linked to WILLIAM TIERNEY, ROBERT TIERNEY, and CC-1. As a result, FEC disclosures for the Scam PACs create the false and misleading appearance of legitimate political or advocacy PAC spending on Shell Entity services.

32.   Certain Scam PAC FEC filings, in addition to declaring payments to the pass-through Shell Entities, also disclosed payments to telemarketing companies under fictitious entity names, as further described below. Based on the investigation, I believe those companies were hired by WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, to make fundraising calls for certain of the Scam PACs from foreign call centers using soundboard technology ("Telemarketing Company-1" and "Telemarketing Company-2," and collectively the "Telemarketing Companies").[16]

33.   WILLIAM TIERNEY, the defendant, used a fake name for his business dealings with the Telemarketing Companies. I have interviewed executive officers of both Telemarketing Companies, who identified their primary contact as "Bill Johnson," and whose descriptions of Johnson match what I know to be a description of WILLIAM TIERNEY. Based on interviews with those officers, and review of emails as further described below,

---

[16] Soundboard-assisted calls allow a telemarketer to monitor a live call and choose pre-recorded messages to play for call recipients in real time, by beginning the call and responding to a call recipient's answers with recorded messages in various sequences.

I have learned that in addition to describing himself as "Bill Johnson" at in-person meetings and over the telephone with the Telemarketing Companies, WILLIAM TIERNEY falsely identified himself as "Bill Johnson" in emails, using an email account for which the "sender" name was "Bill Johnson." In at least one meeting with an executive officer of one of the Telemarketing Company, WILLIAM TIERNEY, under the guise of "Bill Johnson," was accompanied by ROBERT TIERNEY. In addition, in his dealings with the Telemarketing Companies, WILLIAM TIERNEY referred to certain of the Scam PACs as his "clients," when, as described herein, he and his co-conspirators in fact themselves controlled and operated those PACs.

34. Similar to his creation of Shell Entities with misleading names, WILLIAM TIERNEY, the defendant, also directed the Telemarketing Companies to establish their own shell subsidiaries for billing purposes, and to create indistinct names for those entities. As a result, the relevant Scam PACs disclosed in FEC filings that donor money was paid to those vaguely-named subsidiaries. This avoided disclosing that several million dollars of donor funds were, in fact, paid to call centers for additional fundraising – and prevented donors and other members of the public from learning that multiple of the Scam PACs were paying the same entities. In particular, based on my participation in this investigation, my conversations with other law enforcement officers, my conversations with witnesses, and my review of records, I have learned the following:

a. In or about spring 2017, WILLIAM TIERNEY contacted each of the Telemarketing Companies and asked each to establish shell companies for billing purposes so that Scam PAC "clients" — in reality, PACs controlled and operated by WILLIAM TIERNEY, ROBERT TIERNEY, the defendant, and CC-1 — could obscure the recipients of their payments in FEC filings. The Telemarketing Companies each received a memo, which they understood to be from "Bill Johnson," that explained this request. Based on my review of a copy of one of the memos (the "Stealth Subsidiary Memo"), I have learned that the Stealth Subsidiary Memo stated, among other things, the following:

i. "Our PAC clients will want to work with subsidiaries of your company that are not publicly associated with your company or soundboard technology.... Our clients are federal political action committee (PAC) entities. They file periodic reports with the Federal Election Commission (FEC.) These reports list every single expenditure the PACs make. The reported information includes [vendor name and address]."

    ii. "One common practice, for which there
are online tools, is to cross reference vendors.  If multiple
PACs are using the same vendor, this then can become an area of
speculation and/or criticism, whether justified or not.  There
are some common practices that enable PACs to comply with FEC
reporting requirements while legally maintaining a level of
privacy regarding transactions that reduces criticism and
controversy."

    iii. "One of these common practices is that
PACs will ask politically sensitive vendors to form a "stealth
subsidiary." [...]  A company can have a Delaware LLC, but
nowhere in the public record will there be a record that this
entity is associated with its parent.  So long as the parent
company takes care not to disclose its ownership, the ownership
information will likely remain private. ... In our situation, we
would like your company to form a Delaware LLC to do business
exclusively with each of our clients."

    b. The Stealth Subsidiary Memo further listed
**"five best practices that must be followed** to accomplish our
privacy goals," including that the LLCs should each "be formed
on a different day"; should not be named so as to "be suggestive
of your company or soundboard technology"; should have a
separate mailing address than each other LLC, which address
"should have no connection with your company"; and should have
different "authorized signers" on their Certificates of
Formation, which signers should "not [be] someone easily
discoverable on Google as being related to your company or each
other."

    35. Based on my participation in this investigation,
my conversations with other law enforcement officers, my
conversations with witnesses, and my review of records,
including invoices issued to certain of the Scam PACs, I have
learned the following:

    a. Both Telemarketing Companies did establish
new subsidiaries (collectively, the "Stealth Subsidiaries"), as
instructed, under vague names, such as "Shadow Ridge Partners,"
"Ridge Marketing," and "76 Strategies, LLC."  This allowed some
of the Scam PACs to receive bills from, and send and declare
payments to, the Stealth Subsidiaries.  Based on interviews with
individuals employed with both Telemarketing Companies, I have
learned that none of their other clients had ever asked to
establish a shell company for payment or billing processes.

    b. In FEC filings for 2017, Action Coalition PAC, Americans for Law Enforcement PAC, and Grassroots Awareness PAC each listed payments to the Stealth Subsidiaries, but not to the Telemarketing Companies.

    c. In or about fall 2017, individuals working for one of the Telemarketing Companies advised "Bill Johnson" that it no longer was able to bill certain Scam PACs from its Stealth Subsidiaries, due to certain business considerations, and requested that the billing system revert to invoices being issued from the Telemarketing Company itself, rather than the Stealth Subsidiaries. "Bill Johnson" refused, and terminated the business relationship with the Telemarketing Company rather than receive bills from the actual entity to which PAC donor funds were being directed.

*Additional Steps to Conceal Wrongdoing and Evade Detection*

    36. As noted above, WILLIAM TIERNEY, the defendant, masked his identity in interacting with the Telemarketing Companies, including while in the company of ROBERT TIERNEY, the defendant. In addition, based on my review of records, including solicitation materials, the Email Search Warrant Returns, and business documents, and my conversations with witnesses and other law enforcement officers, I have learned that National Campaign PAC made use of another fictitious identity. Specifically, I am aware of the following:

    a. Certain National Campaign PAC fundraising mailings were signed in the name of "Emma Smith," with the title "Volunteer Chairman." Certain of those solicitations included purported contact information for "Emma Smith," including the email address "emma@prolifecommittee.org" and a Washington D.C.-based phone number. In a similar solicitation signed in the name of Emma Smith, the mailer stated, "I'm a pro-life woman myself, as are our Pro-Life Committee's founder and many of our colleagues."

    b. The address emma@prolifecommittee.org was registered in association with an email address for which the recovery email is an email account used by WILLIAM TIERNEY, the defendant.

    c. I and other law enforcement officers have reviewed the Email Search Warrant Returns, bank records including employee payroll and payment records, and public records, and have been unable to confirm the existence of Emma Smith. We also have been unable to identify any emails to or from Emma Smith in the Email Search Warrant Returns, or indeed

any apparent reference to volunteers, volunteer activity on behalf of National Campaign PAC, or any duties or existence of a Volunteer Chairman other than in fundraising solicitation materials.

37.   Based on my interview with an individual identified in FEC filings as a Treasurer of one of the Scam PACs ("Witness-1") and a review of records, I have learned that Witness-1 was hired as an independent contractor to, in sum and substance, perform bookkeeping compliance services for the relevant PAC in or about 2017.  Witness-1 was hired by an individual who represented herself to have the first name of CC-1 but the last name "Johnson," purportedly working for Compliance Consulting.  Based on my participation in this investigation, I believe the person who hired Witness-1 was CC-1, using a fraudulent identity.  Witness-1 was paid approximately $300 per month, and was required to sign a confidentiality agreement with Compliance Consulting as a condition of her employment.

38.   Further, based on a review of public records, I have learned that in FEC disclosures, as described in part above, the primary managers and operators of the Scam PACs – WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, and CC-1 – either omitted or altered their names from required filings. Indeed, the names of WILLIAM TIERNEY and ROBERT TIERNEY do not appear in any FEC filings for the Scam PACs.[17]  The name of CC-1 also does not appear in any FEC filings for the Scam PACs; rather, the middle and last names of CC-1 are listed as the Treasurer for the first two PACs established by the defendants and CC-1.

39.   In addition to taking steps to avoid being identified by business partners and the FEC, WILLIAM TIERNEY and ROBERT TIERNEY, the defendants, and CC-1 have made other efforts to avoid being publicly identified as associated with the Scam PACs.  This has included refusing to respond to press inquiries, despite the Scam PACs' claimed efforts to raise awareness of their various purported causes.  Specifically, based on my

[17] In or about April 2014, WILLIAM TIERNEY, the defendant, sent an email to himself with the subject "only a treasurer."  The body of the email generally describes the FEC requirement that a PAC identify a treasurer, including that "[w]ithout a live person to provide notice to and/or attach liability to, the [FEC] may find itself at a significant disadvantage in protecting the public interest and in ensuring compliance with the laws it is responsible for enforcing."

participation in this investigation, my conversations with other
law enforcement officers, my conversations with witnesses, and
my review of records, including the Email Search Warrant Returns
and publicly-available information, I have learned the
following:

        a.    In or about August 2016, a journalist
("Journalist-1") made numerous inquiries regarding certain of
the Scam PACs, contacting multiple email addresses and phone
numbers associated with the relevant PACs.  On or about August
11, 2016, WILLIAM TIERNEY sent himself an email with the name
and employer of Journalist-1.  On or about August 12, 2016,
Journalist-1 published an article titled: "Is this shadowy
network of PACs ripping off pro-life voters around the country?"
According to the article, Journalist-1 did not receive any
response to the communications.

        b.    In or about fall 2016, another journalist
("Journalist-2") made inquiries regarding certain of the
Scam PACs, contacting multiple emails and phone numbers
associated with the relevant PACs.  On or about April 25, 2017,
Journalist-2 published an article titled: "Scamming the Pro-Life
Movement."  According to the article, Journalist-2 did not
receive any response to the communications.  On or about April
25, 2017, WILLIAM TIERNEY received an email from another
individual with the title of Journalist-2's article, "Scamming
the Pro-Life Movement," and attachments.

        c.    During the time period from April 2015 to
September 2016, WILLIAM TIERNEY emailed at least approximately
seven separate articles or internet posts that discussed
possible fraudulent PACs.  Each of these emails included the
phrase "Scam PAC" in the subject line.  WILLIAM TIERNEY sent
approximately six of these emails to himself, and one to ROBERT
TIERNEY.  Additionally, in or about September 2014, WILLIAM
TIERNEY emailed himself a link to a complaint filed in federal
court alleging various civil claims against a PAC and other
individuals and entities.  The complaint alleged, among other
things, that fundraising by the defendant in that case
constituted a "Scam PAC."

        d.    One of the articles sent by WILLIAM TIERNEY
to himself, published in or about July 2015, specifically
referenced Republican Majority Campaign PAC, one of the
Scam PACs.  Approximately one minute before WILLIAM TIERNEY
emailed that article to himself, a different email address
associated with WILLIAM TIERNEY, for which the recovery email
account is WILLIAM TIERNEY's personal email address, sent a

message to another individual ("CC-2") containing the text of
the article and stating: "The Chairwoman of the Federal Election
Commission wrote an editorial for RollCall criticizing
Republican Majority Campaign because of their failure to donate
to any candidates."  In response, CC-2 replied, in part, "Do you
want an alternative?  The reality is that to these people there
will be little difference between 0 and 5%."  Based on my
training, experience, and participation in this investigation, I
believe that in this email exchange, WILLIAM TIERNEY and CC-2
were discussing whether an increase in political spending beyond
the de minimis amount spent by the Scam PACs would reduce
scrutiny by the FEC and/or the public.

### Search of Property Utilized by the Defendants

40.  Based on my review of the Email Search Warrant
Returns, I have learned that WILLIAM TIERNEY, the defendant,
owns an office suite at a corporate office park in Gilbert,
Arizona (the "Tierney Office"), and that WILLIAM TIERNEY, ROBERT
TIERNEY, CC-1, and others known and unknown have operated and
managed the Scam PACs out of the Tierney Office.

41.  On or about April 10, 2018, other law enforcement
officers and I executed a judicially-authorized search warrant
at the premises of the Tierney Office.  Based on my
participation in that search and my conversations with other law
enforcement officers, I have learned, among other things, that:

a.   The Tierney Office contained several offices
and cubicles.  One of the offices contained a workspace that
appeared to be used by WILLIAM TIERNEY, the defendant.  A desk
located in WILLIAM TIERNEY's workspace contained business cards
with the name "Bill Johnson" at Insight Consulting, LLC.

b.   The Tierney Office contained a mailroom with
equipment for producing mass mailings.  It also contained an
area for sorting incoming mail, with labels on different slots
for mail recipients including: "William Tierney," "Edison,"
"PMK," "RFP," "National Campaign," "Voter Education," and
"Political Call Center."  It also contained printed donation
solicitation mailings for "Autism Awareness" and "Pro-Life
Committee."

c.   The Tierney Office contained what appeared
to be draft scripts for telephone fundraising calls for, among
others: "Republican Victory Campaign, a Project of the National
Campaign," "Republican Majority Campaign," "Pro-life Action
Campaign—RightMarch PAC," and "Pro-Life Committee, A Project of
the National Campaign."  Certain of the scripts contained hand-

written edits and notations.  For example, one such script had
the hand-written notation: "Winner! Per B.T."  Based on my
participation in this investigation, I have learned that WILLIAM
TIERNEY is commonly known as "Bill Tierney," and I therefore
believe that "B.T." refers to WILLIAM TIERNEY.  Another such
script had the hand-written notation: "Winner per Robert".
Based on my participation in this investigation, I believe that
"Robert" refers to ROBERT TIERNEY, the defendant.

         d.    Based on a review of physical documents in
the Tierney Office, other law enforcement officers and I were
unable to identify any documents relating to political or
campaign advocacy, legislative initiatives, or public education
relating to any of the issues purportedly endorsed by the Scam
PACs.  Rather, the documents in the Tierney Office related to
fundraising and the finances of the Scam PACs and the Shell
Entities.

        WHEREFORE the deponent prays that WILLIAM TIERNEY and
ROBERT TIERNEY, the defendants, be arrested and imprisoned or
bailed, as the case may be.

                                           _____
                                   JEFFREY ROSENMAN
                                   Special Agent
                                   United States Attorney's Office
                                    Southern District of New York

Sworn to before me this
14th day of May 2018

_____
THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK